UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MANZOOR QADAR,

                        Plaintiff,

                -v.-

SECRETARY OF STATE ALEJANDRO MAYORKAS,
UNITED STATES DEPARTMENT OF STATE,
JOHN DOE #1, ATTORNEY GENERAL MERRICK
GARLAND, and UNITED STATES DEPARTMENT
OF JUSTICE, INTERNATIONAL PRISONER
TRANSFER UNIT,

                        Defendants.

---

18 Civ. 6817 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Manzoor Qadar is a citizen of the United Kingdom who is currently incarcerated at the Federal Correctional Institution in Otisville, New York ("FCI Otisville").  Since 2013, consular officials employed by the United States Department of State have denied requests from Plaintiff's wife and children, who are citizens of and reside in the United Kingdom, for visas that would permit them to travel to the United States to visit Plaintiff.  In addition, the United States Department of Justice's International Prisoner Transfer ("IPT") Unit has denied repeated requests from Plaintiff to be transferred to the custody of the United Kingdom, so that Plaintiff may serve the remainder of his sentence closer to his family.

In his Second Amended Complaint (the "SAC"), which is the operative pleading in this matter, Plaintiff brings claims against the Secretary of State, the Department of State, John Doe #1, the Attorney General, and the

Department of Justice IPT Unit (collectively, "Defendants"),[1] alleging that the denial of visas to his family members violates Plaintiff's First Amendment right to freely exercise his religion and his Fifth Amendment right to due process; is arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. ch. 5 (the "APA"); and substantially burdens his religious exercise, in violation of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4 ("RFRA").  Plaintiff further claims that the denial of his transfer requests likewise violates his Fifth Amendment right to due process and runs afoul of the APA.  Finally, he brings a claim pursuant to *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), against the Secretary of State, the Department of State, and John Doe #1, a consular official who denied Plaintiff's family members' visa requests in 2013. Plaintiff seeks declaratory and mandamus relief compelling the Government to issue visas to Plaintiff's family or to transfer him to the United Kingdom, as well as an award of damages.

Now before the Court is Defendants' motion to dismiss the Second Amended Complaint, in which Defendants argue that Plaintiff's constitutional and statutory challenges to the visa denials are precluded by the doctrine of consular non-reviewability; that Plaintiff's *Bivens* claims against the Secretary of State and the Department of State are not plausibly alleged; that Defendant John Doe #1 was not properly served; and that Plaintiff lacks standing to

---

[1]     Plaintiff initially named then-Secretary of State Mike Pompeo and then-Attorney General William Barr.  Their respective successors are automatically substituted as defendants pursuant to Fed. R. Civ. P. 25(d).

challenge the denial of his transfer requests.  For the reasons set forth below,
the Court grants Defendants' motion as to all Defendants apart from John
Doe #1.

**BACKGROUND**[2]

**A.    Factual Background**

**1.    Plaintiff's Conviction and Incarceration**

Plaintiff is a citizen of the United Kingdom.  (SAC ¶ 1).  In 1996, Plaintiff
traveled to New York from the United Kingdom and participated in the killing of
his cousin, Shaukat Parvez, in Queens.  (*Id.* at ¶¶ 11-14).  Plaintiff was indicted
in the United States District Court for the Eastern District of New York on
charges of murder-for-hire, in violation of 18 U.S.C. § 1958; conspiracy to
commit murder-for-hire, in violation of the same statute; and possession of a
firearm in furtherance of the murder-for-hire charges, in violation of 18 U.S.C.
§ 924(c).  (*Id.* at ¶ 15).  In April 2002, following a jury trial, Plaintiff was
convicted on all three charges.  (*Id.* at ¶ 16).  In June 2003, Plaintiff was
sentenced to concurrent mandatory terms of life imprisonment on the murder-
for-hire and conspiracy counts, followed by a mandatory consecutive term of
five years' imprisonment on the firearm count.  (*Id.* at ¶ 17).

---

[2]    The facts in this Opinion are drawn from Plaintiff's Second Amended Complaint ("SAC"
(Dkt. #39)), which is the operative pleading in this case, and the exhibits attached
thereto ("SAC Ex. []"), as well as from the Declaration of Bryan Giblin submitted in
support of Defendants' request for a conference on their anticipated motion to dismiss
("Giblin Decl." (Dkt. #9-1)).

For ease of reference, the Court refers to Defendants' Amended Memorandum of Law in
Support of Their Motion to Dismiss as "Def. Br." (Dkt. #57); Plaintiff's Memorandum of
Law in Opposition to Defendants' Motion to Dismiss as "Pl. Opp." (Dkt. #62); and
Defendants' Reply Memorandum of Law as "Def. Reply" (Dkt. #63).

During the pendency of his prosecution, Plaintiff was held at the Metropolitan Detention Center in Brooklyn.  (SAC ¶ 18).  Following his sentencing, he was moved to the United States Penitentiary Beaumont in Texas and subsequently to the United States Penitentiary Hazelton in West Virginia, both of which are high-security facilities.  (*Id.*).  In 2010, Plaintiff was transferred to FCI Three Rivers, a medium-security facility in Texas.  (*Id.* at ¶ 19).  Since 2012, he has been held at FCI Otisville, also a medium-security facility.  (*Id.* at ¶ 20).

### 2.    Family Members' Efforts to Travel to the United States

Plaintiff's wife and children are citizens of the United Kingdom.  (SAC ¶ 21).  At various times between 2001, when Plaintiff came into the United States' custody, and 2008, members of Plaintiff's family traveled from the United Kingdom to the United States to visit Plaintiff.  (*Id.*).  Prior to 2008, citizens of the United Kingdom were permitted to travel to the United States pursuant to the Visa Waiver Program ("VWP"), which allowed for citizens of the United Kingdom and certain other countries to enter the United States without advance procurement of a visa or other travel authorization document.  (*Id.* at ¶ 22).  During this period, members of Plaintiff's family who were citizens of the United Kingdom traveled to the United States under the VWP.  (*Id.* at ¶ 23).  In 2008, the United States modified the terms of the VWP to require travelers to obtain prior authorization to enter the United States by applying through the Electronic System for Travel Authorization ("ESTA").  (*Id.* at ¶ 22).

In 2013, Plaintiff's wife Fahmeeda, son Abu Baker, and daughter Juwairiah attempted to travel from the United Kingdom to the United States to visit Plaintiff. (SAC ¶ 24). They purchased round-trip tickets between London and New York, and submitted an application through ESTA for authorization to travel. (*Id.*). When they arrived at the airport in London, they were informed that the airline did not have an ESTA authorization on file and, as a result, they could not board the flight to the United States. (*Id.* at ¶ 25). Fahmeeda, Abu Baker, and Juwairiah subsequently submitted a new application through ESTA, seeking to reschedule their trip, but the application was denied. (*Id.* at ¶ 26).

Due to the denial of their ESTA application, on or about June 26, 2013, Fahmeeda, Abu Baker, and Juwairiah applied to the United States Department of State for temporary visitor visas. (SAC ¶ 27). They were directed to appear at the U.S. Embassy in London on July 16, 2013, for a visa interview, and did so. (*Id.* at ¶¶ 27-28). During the interview, the consular officer, Defendant John Doe #1, allegedly demanded that Fahmeeda remove the headscarf that covered her head and face. (*Id.* at ¶ 28). Abu Baker told John Doe #1 that his mother had a right to wear the headscarf consistent with her religious beliefs, and an argument ensued. (*Id.*). John Doe #1 asked the nature of the charges against Plaintiff, and Fahmeeda told him that Plaintiff had been convicted of conspiracy to commit murder. (*Id.* at Ex. B).

After the interview, John Doe #1 refused all three visa applications under Section 221(g) of the Immigration and Nationality Act (the "INA"), 8 U.S.C.

§ 1201(g), subject to additional administrative processing, on the basis that Plaintiff's family members were ineligible for entry.  (Giblin Decl. ¶ 3).  More than two years later, on September 8, 2015, a consular officer notified Fahmeeda, Abu Baker, and Juwairiah that their visa applications had been denied under Section 212(a)(3)(B) of the INA, 8 U.S.C. § 1182(a)(3)(B).  (*Id.* at ¶ 4; *see also* SAC ¶ 29).[3]  This provision, entitled "Terrorist Activities," renders inadmissible a noncitizen of the United States who meets any of nine criteria concerning connections to terrorist activity, terrorist groups, or to a spouse or parent with terrorist connections.  8 U.S.C. § 1182(a)(3)(B).  (*See* SAC ¶ 31).  The State Department's consular database contains no record indicating that Fahmeeda, Abu Baker, and Juwairiah have ever been approved for or issued U.S. visas.  (Giblin Decl. ¶ 5).

### 3.    Plaintiff's Requests for Transfer to the United Kingdom

Separately, Plaintiff has submitted multiple written requests to the Department of Justice IPT Unit, requesting transfer to the United Kingdom pursuant to the Convention on the Transfer of Sentenced Persons (the "Convention"), T.I.A.S. No. 10824, E.T.S. 112 (1983); the Transfer of Offenders to or from Foreign Countries Act (the "Transfer Act"), 18 U.S.C. §§ 4100-4115;

---

[3]    Because John Doe #1 has not been identified, the Court is not able to determine whether the consular officer who denied the visas in 2015 is John Doe #1 or a different individual.  The Giblin Declaration seems to suggest that it was a different individual.  (*See* Giblin Decl. ¶¶ 3-4 (referring to the official who conducted the interview, *i.e.* John Doe #1, as "*the* consular official," and the official who notified Plaintiff's wife and children that their visas had been denied as "*a* consular official" (emphases added))).  Plaintiff does not allege that John Doe #1 issued the denials in 2015 under 8 U.S.C. § 1182(a)(3)(B); rather, he alleges that "the denial of the B2 visa for Fahmeeda, [Abu] Baker and Juwairiah was purposely affected by John Doe #1 or a person(s) acting under his advice or authority."  (SAC ¶ 45).

6

or any other applicable law.  (SAC ¶¶ 47-51).  To date, the IPT Unit has denied

Plaintiff's requests.  (*Id.* at ¶ 52).[4]  The most recent denial letters provided to

Plaintiff state that "[t]he United States denied the transfer application because

of the seriousness of the offense and because of law enforcement concerns."

(*Id.*).  The letters also indicate that, while there is no administrative appeal

process, Plaintiff may reapply every two years.  (*Id.* at Ex. D).  However,

"[u]nless [Plaintiff] is able to show that the reasons supporting the denial of his

transfer application have changed substantially, it is unlikely that the United

States will change its decision."  (*Id.*).

### B.    Procedural Background

On July 27, 2018, Plaintiff filed a *pro se* petition for a writ of habeas

corpus under 28 U.S.C. § 2241, naming as defendants the Warden of FCI

Otisville, the Department of Homeland Security, the United States Government,

and the United State Embassy in the United Kingdom.  (Dkt. #1).  The Court

issued an Order to Answer on September 21, 2018.  (Dkt. #5).  On

December 11, 2018, the named defendants filed a letter requesting a

conference regarding an anticipated motion to dismiss (Dkt. #9), and they

renewed their request on February 19, 2019 (Dkt. #14).  In the interim, on

January 14, 2019, Plaintiff submitted a request for appointment of counsel to

represent him.  (Dkt. #13).  By Order dated February 19, 2019, the Court

---

[4]    Plaintiff most recently filed a transfer request in 2019.  (*See* Dkt. #27 at 1).  The parties
have not updated the Court on the status of that request since October 2, 2019, when it
remained pending.  (*See* Dkt. #35 at 2:22-23, 10:10-17).  However, because an approval
would moot this case, the Court assumes that the request either remains pending or
was ultimately denied.

granted the defendants' request for a conference and denied without prejudice Plaintiff's request for appointment of counsel.  (Dkt. #15).

The Court held a pretrial conference on March 15, 2019, during which conference the Court directed Plaintiff to file an amended petition on or before April 15, 2019, and set the briefing schedule for the defendants' motion to dismiss.  (*See* Minute Entry for March 15, 2019; *see also* Dkt. #20).  Plaintiff filed a First Amended Complaint on April 4, 2019.  (Dkt. #22).  On July 19, 2019, the Court issued an Order appointing counsel for Plaintiff under the Criminal Justice Act.  (Dkt. #29).  Mr. Jeffrey G. Pittell filed a notice of appearance on behalf of Plaintiff on August 1, 2019.  (Dkt. #30).[5]  The Court held a status conference with the parties on October 2, 2019, during which conference the Court directed Plaintiff to submit a second amended pleading on or before December 6, 2019, and directed the defendants to notify the Court on or before December 20, 2019, whether they intended to answer or move to dismiss.  (*See* Minute Entry for October 2, 2019).  The Court subsequently granted an extension of those deadlines on November 25, 2019.  (Dkt. #38).

Plaintiff, through counsel, filed his Second Amended Complaint on February 7, 2020.  (Dkt. #39).  The SAC states claims against former Secretary of State Mike Pompeo in his official capacity; the Department of State; John Doe #1; former Attorney General William Barr in his official capacity; and the Department of Justice IPT Unit.  (*See id.*).  On February 21, 2020, the newly-designated Defendants notified the Court that they intended to move to dismiss

---

[5]     The Court pauses to extend its appreciation to Mr. Pittell for his work on this case.

the SAC.  (Dkt. #41).  By memorandum endorsement dated February 24, 2020, the Court set a briefing schedule on Defendants' motion to dismiss (Dkt. #42); the Court subsequently granted an extension of the briefing deadlines (Dkt. #44).

On April 23, 2020, the Court stayed the case pending adjudication of Plaintiff's motion for compassionate release submitted to the sentencing court in the Eastern District of New York.  (Dkt. #46).  That motion was denied, and this Court dissolved the stay and reset the briefing schedule for Defendants' motion to dismiss on June 2, 2020.  (Dkt. #48).  Following a further extension of the briefing schedule, Defendants filed their Motion to Dismiss the Second Amended Complaint on July 17, 2020 (Dkt. #53-54), and an Amended Memorandum of Law in Support, containing only non-substantive modifications, on July 20, 2020 (Dkt. #57).  Plaintiff filed his Memorandum of Law in Opposition on September 14, 2020 (Dkt. #62), and Defendants filed their Reply Memorandum of Law in Support on September 28, 2020 (Dkt. #63). The motion is now ripe for resolution.

## DISCUSSION

### A.    Standard of Review

#### 1.    Dismissal Under Federal Rule of Civil Procedure 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under [Federal Rule of Civil Procedure] 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Luckett* v. *Bure*, 290 F.3d 493, 496 (2d Cir. 2002) (internal quotation marks omitted).  "The court must

9

take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal citations and quotation marks omitted); *accord Kraiem* v. *JonesTrading Inst. Servs. LLC*, No. 19 Civ. 5160 (ALC), 2020 WL 5819557, at *4 (S.D.N.Y. Sept. 30, 2020). "In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett*, 290 F.3d at 496-97.

## 2. Dismissal Under Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept as true all well-pleaded factual allegations in the complaint. *Id.* However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Twombly*, 550 U.S. at 555 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan* v. *Allain*, 478 U.S. 265, 286 (1986))). Furthermore, allegations in a complaint

that are contradicted by either more specific allegations or documentary evidence the Court may consider are not entitled to a presumption of truthfulness.  *See L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

## B.    Plaintiff's Visa Denial Claims

### 1.    The Doctrine of Consular Non-Reviewability

The Government principally argues that Plaintiff's constitutional and statutory claims against the Secretary of State and the Department of State related to the denial of Plaintiff's family members' visa applications must be dismissed under the doctrine of consular non-reviewability.  (*See* Def. Br. 15-24; Def. Reply 1-8).  This doctrine reflects the general principle "that a consular officer's decision to deny a visa is immune from judicial review."  *Am. Acad. of Religion* v. *Napolitano*, 573 F.3d 115, 123 (2d Cir. 2009).[6]  In this regard, the Supreme Court has repeatedly held that "[t]he power of [C]ongress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications."  *Kleindienst* v.

---

[6]    It is unsettled in this Circuit whether the doctrine of consular non-reviewability is jurisdictional or prudential.  *See Am. Acad. of Religion* v. *Napolitano*, 573 F.3d 115, 123 (2d Cir. 2009) (declining to label this doctrine "jurisdictional," while stating that the doctrine may "mean[ ] that the generally available federal question jurisdiction provided by section 1331 to adjudicate [constitutional] claims is withdrawn where the claim is based on a consular officer's denial of a visa," or that it may mean "that prudential considerations, perhaps arising from separation of powers concerns, counsel against exercising normally available jurisdiction").  But whatever the basis for the doctrine, "it is settled that the judiciary will not interfere with the visa-issuing process."  *Hsieh* v. *Kiley*, 569 F.2d 1179, 1182 (2d Cir. 1978).

*Mandel*, 408 U.S. 753, 766 (1972) (internal quotation marks omitted) (quoting *Lem Moon Sing* v. *United States*, 158 U.S. 538, 547 (1895)).  "It follows that a court presented with a petition challenging the decision of a consular officer 'does not have jurisdiction to review a consular official's decision, even if its foundation was erroneous, arbitrary, or contrary to agency regulations.'"  *Saleh* v. *Tillerson*, 293 F. Supp. 3d 419, 424 (S.D.N.Y. 2018) (quoting *Ngassam* v. *Chertoff*, 590 F. Supp. 2d 461, 466-67 (S.D.N.Y. 2008)).

This broad prohibition on judicial review, however, is subject to one narrow exception: courts have jurisdiction to review consular decisions where the challengers assert constitutional, rather than statutory, claims.  *Saleh*, 293 F. Supp. 3d at 424 (citing *Am. Acad. of Religion*, 573 F.3d at 125; *Mandel*, 408 U.S. at 770; *Kerry* v. *Din*, 576 U.S. 86, 103-04 (2015) (Kennedy, J., concurring in the judgment)).  The exception itself is further limited: "[a]bsent an affirmative showing of bad faith on the part of the consular officer," *Din*, 576 U.S. at 105 (Kennedy, J., concurring in the judgment), "a court may ask only whether the Government has provided a 'facially legitimate and bona fide reason' for its decision; a court may neither 'look behind the exercise of that discretion, nor test it by balancing its justification against the [constitutional] interests of those who seek' review of a consular determination," *Saleh*, 293 F. Supp. 3d at 425 (quoting *Mandel*, 408 U.S. at 770).

Defendants argue that the exception may be inapplicable even to Plaintiff's constitutional claims because he is not a U.S. citizen.  (*See* Def. Br. 16-17 ("The body of case law addressing consular nonreviewability strongly

suggests that the limited judicial inquiry conducted in *Mandel* and its progeny — *i.e.*, on the basis of a claim that a consular decision burdened a U.S. citizen's constitutional rights — is only available to U.S. citizens." (collecting cases))).  Plaintiff responds that none of the cases cited by Defendants "expressly hold[s] that, as a matter of law, the doctrine of consular nonreviewability bars review of a constitutional violation committed upon a non-citizen who is present in the United States."  (Pl. Opp. 15 n.2).

The Court recognizes that the case law on this issue generally highlights the citizenship of the individual asserting his or her rights.  *See, e.g.*, *Trump* v. *Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("A[l]though foreign nationals seeking admission have no constitutional right to entry, this Court has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen."); *Din*, 576 U.S. at 104 (Kennedy, J., concurring in the judgment); *Yafai* v. *Pompeo*, 912 F.3d 1018, 1021 (7th Cir. 2019), *reh'g en banc denied*, 924 F.3d 969 (7th Cir. 2019); *Lleshi* v. *Kerry*, 127 F. Supp. 3d 196, 201 (S.D.N.Y. 2015) ("This case does not implicate the limited exception to the doctrine identified by the Supreme Court in *Mandel* and further expounded by the Second Circuit in *American Academy of Religion*.  As an initial matter, none of the Plaintiffs are United States citizens."); *but see Amiri* v. *Sec'y, Dep't of Homeland Sec.*, 818 F. App'x 523, 527 (6th Cir. 2020) (unpublished decision) (framing the exception as providing that "judicial review of a visa decision made by consular officers abroad is available if that determination implicates the constitutional rights of *persons in the United*

13

*States*" (emphasis added)); *Am. Acad. of Religion*, 573 F.3d at 125 ("We conclude that, where a plaintiff, *with standing to do so*, asserts a First Amendment claim to have a visa applicant present views in this country, we should apply *Mandel* to a consular officer's denial of a visa." (emphasis added)). Ultimately, the Court concludes that it need not decide in this case whether the exception is categorically unavailable to noncitizens like Plaintiff who are resident in the United States and entitled to assert many of the same constitutional protections as citizens. Even if the exception were available to Plaintiff, his claims must be dismissed for other reasons.

### 2.    First Amendment Free Exercise Claim

In Count One of the SAC, Plaintiff asserts that "Defendants' denial of B2 visas for Plaintiff's family ... interfered with [Plaintiff's] right to free exercise of religion." (SAC ¶ 58). Defendants argue in their motion that Plaintiff does not allege any facts in support of this conclusory statement and thus the claim is inadequately pleaded. (*See* Def. Br. 17).

It is undisputed that Plaintiff is entitled to First Amendment protections while he is physically present in the United States. *See Kwong Hai Chew* v. *Colding*, 344 U.S. 590, 596 n.5 (1953) (explaining that the rights guaranteed to "all people within our borders" "include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens."); *accord Am.-Arab Anti-Discrimination Comm.* v.

*Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995).[7]  Nevertheless, the Court is unable to ascertain in what way Plaintiff's ability to freely exercise his religion was infringed by Defendants' conduct.  Even accepting as true Plaintiff's allegations that John Doe #1 demanded that Fahmeeda remove her headscarf during the visa interview at the U.S. Embassy in London (*see* SAC ¶ 28), and even drawing Plaintiff's preferred inference that the visas were denied based on Plaintiff's family members' religious beliefs rather than legitimate security concerns (*see* Pl. Opp. 12-13), only Plaintiff's family members' freedom of religious exercise was implicated by such conduct.

Thus, Plaintiff has not adequately pleaded facts demonstrating a violation of *his* First Amendment rights.  Consequently, even if this constitutional claim were not categorically barred by the doctrine of consular non-reviewability, it must be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

### 3.    Due Process Claim

Plaintiff's SAC alleges in conclusory terms that "Defendants' denial of B2 visas for Plaintiff's family, interfered with [Plaintiff's] right to due process." (SAC ¶ 61).  The SAC does not explain the interest held by Plaintiff and protected by due process upon which Defendants allegedly infringed, but Plaintiff's opposition memorandum clarifies that he is claiming a "liberty"

---

[7]    Additionally, even though Plaintiff is incarcerated, he "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell* v. *Procunier*, 417 U.S. 817, 822 (1974).

interest in "the right for a person to freely associate [with] the person's family." (Pl. Opp. 14).[8]  Defendants respond that there is no support in case law for "the existence of a broad due process right to family unity, let alone a prisoner's right to receive visitation from his wife and adult children."  (Def. Reply 2).  The Court agrees with Defendants.

*Kerry* v. *Din* is instructive, though not dispositive, on this point.  In *Din*, the Supreme Court considered a mandamus petition by a U.S. citizen challenging, as a violation of due process, the denial of her noncitizen spouse's application for an immigrant visa.  Five Justices agreed that the mandamus petition was properly denied, but based on two different rationales.  Justice Scalia, joined by Chief Justice Roberts and Justice Thomas, held that a U.S. citizen does not have a liberty interest, protected by the Due Process Clause, in living in the United States with a spouse.  *Din*, 576 U.S. at 88 (plurality opinion).  Justice Kennedy, writing for himself and Justice Alito, found it unnecessary to decide whether the plaintiff had a protected liberty interest in the proper adjudication of her husband's visa application because even if she did, the notice she received regarding the visa denial satisfied due process.  *Id.* at 102 (Kennedy, J., concurring in the judgment).  His opinion was explicit that

---

8       With the caveat discussed previously that it is not clear whether the exception to consular non-reviewability applies to Plaintiff as a noncitizen, there is no other citizenship bar to Plaintiff invoking the protections of the Fifth Amendment Due Process Clause.  *See Zadvydas* v. *Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").

16

"[t]oday's disposition should not be interpreted as deciding whether a citizen has a protected liberty interest in the visa application of her alien spouse." *Id.*

Thus, while the *Din* plurality's position does not bind this Court, Plaintiff's claim to a protected liberty interest — *i.e.*, the alleged right of a noncitizen to receive a visit from his noncitizen wife and adult children at the facility where he is incarcerated — is even more tenuous than the liberty interest asserted in *Din.* First, courts in this Circuit have not recognized a due process interest in family members' visa applications. *See Burrafato* v. *U.S. Dep't of State*, 523 F.2d 554, 555 (1975) (holding that no constitutional right of citizen was violated by denial of her noncitizen husband's visa application); *United States* v. *Saipov*, 412 F. Supp. 3d 295, 301 (S.D.N.Y. 2019) (dismissing noncitizen's challenge to the denial of nonimmigrant visa applications submitted by his immediate family members because, *inter alia*, "Saipov has not established that the denial of his relatives' visa applications violates his constitutional rights"); *Lleshi,* 127 F. Supp. 3d at 201 ("[B]ecause visas do not constitute a life, liberty, or property interest sufficient to invoke the protections of due process, Plaintiffs have failed to identify a valid constitutional claim upon which to predicate any challenge to the consular officer's decision."); *Yu Chu Hom* v. *Goldbeck*, No. 08 Civ. 3159 (SLT), 2010 WL 2265054, at *3 (E.D.N.Y. May 28, 2010) (dismissing citizens plaintiff's claim that her due process rights were violated when her noncitizen brother's visa was denied); *but see Bustamante* v. *Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (recognizing a protected liberty interest in citizen plaintiff's marriage "that gives rise to a

right to constitutionally adequate procedures in the adjudication of her husband's visa application," on the basis that "[f]reedom of personal choice in matters of marriage and family life is, of course, one of the liberties protected by the Due Process Clause").

*Second*, as Defendants point out, "lower courts generally have not recognized a constitutionally protected liberty interest in maintaining a parent-adult child relationship." (Def. Br. 17 n.12 (citing *Santos* v. *Lynch*, No. 15 Civ. 979 (SAB), 2016 WL 3549366, at *3-4 (E.D. Cal. June 29, 2016); *Udugampola* v. *Jacobs*, 795 F. Supp. 2d 96, 104 (D.D.C. 2011); *McCurdy* v. *Dodd*, 352 F.3d 820, 822 (3d Cir. 2003) (analyzing due process rights under the Fourteenth Amendment); *Butera* v. *District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001))).  The cases Plaintiff cites in opposition are inapposite.  *See Gottlieb* v. *County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (addressing procedural due process protections in custody proceedings); *Tenenbaum* v. *Williams*, 193 F.3d 581, 593 (2d Cir. 1999) (recognizing liberty interest of parents "in the care, custody, and management of their children"), *cited in* Pl. Opp. 14.

*Finally*, courts generally have not recognized a constitutional liberty interest held by prisoners in "access to a particular visitor."  *Ky. Dep't of Corrs.* v. *Thompson*, 490 U.S. 454, 461 (1989) (internal quotation marks omitted); *see also Dunn* v. *Castro*, 621 F.3d 1196, 1202-03 & n.4 (9th Cir. 2010) (stating that the Ninth Circuit and other federal appeals courts have "declined to recognize a prisoner's constitutional right to receive visits" and collecting cases).  This is because the denial of access to specific visitors "is well within the terms of

18

confinement ordinarily contemplated by a prison sentence." *Ky. Dep't of Corrs.*, 490 U.S. at 461 (internal quotation marks omitted); *accord Macedon* v. *Cal. Dep't of Corrs.*, 67 F. App'x 407, 408 (9th Cir. 2003) (unpublished decision).

In sum, the relevant case law strongly weighs against Plaintiff's claim to a protected liberty interest in the approval of his family members' visa applications so that they may visit him at his facility of incarceration.  Plaintiff has not offered a compelling reason why this Court should depart from this precedent, and the Court has not identified one.  Accordingly, the Court concludes that Plaintiff's Due Process claim must be dismissed.

### 4.    Statutory Claims

Defendants argue in their reply memorandum that the Court should deem Plaintiff's APA and RFRA challenges to the visa denials to be abandoned because he does not address in his opposition memorandum Defendants' argument that those claims are barred by consular non-reviewability.  (Def. Reply 8).  *See generally Jennings* v. *Hunt Cos.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) ("A district court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted) (collecting cases)).  Defendants are correct that Plaintiff does not respond to this argument.  In any event, Plaintiff's challenges to the visa denials under the APA and RFRA fall outside the exception to consular non-reviewability for constitutional claims, and thus are non-cognizable.  *See Saleh*, 293 F. Supp. 3d at 424; *see also Abdo* v.

*Tillerson*, No. 17 Civ. 7519 (PGG), 2019 WL 464819, at *4 (S.D.N.Y. Feb. 5, 2019); *Lleshi*, 127 F. Supp. 3d at 200; *Yu Chu Hom*, 2010 WL 2265054, at *4.

## C.    Plaintiff's *Bivens* Claims

Count Seven of Plaintiff's SAC asserts a *Bivens* claim against the Secretary of State, the Department of State, and John Doe #1.  (SAC ¶¶ 77-79). The claims against the Secretary of State and the Department of State must be dismissed for lack of subject matter jurisdiction.  The Court does not resolve the claim against John Doe #1 at this time, as discussed *infra*.

*Bivens* recognized an implied cause of action under the Constitution for damages arising out of constitutional torts by federal officers.  *See* 403 U.S. at 397 ("Having concluded that petitioner's complaint states a cause of action under the Fourth Amendment, we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment." (internal citations omitted)).  The Supreme Court subsequently extended *Bivens* to cover two additional constitutional claims, in addition to unlawful searches and seizures: in *Davis* v. *Passman*, 442 U.S. 228 (1979), the Court recognized an implied cause of action under the Fifth Amendment Due Process Clause for gender discrimination; and in *Carlson* v. *Green*, 446 U.S. 14 (1980), the Court recognized a cause of action under the Eighth Amendment for a federal prisoner's claim for failure to provide adequate medical treatment.  However, "[t]hese three cases — *Bivens*, *Davis*, and *Carlson* — represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself."  *Ziglar* v. *Abbasi*, 137

20

S. Ct. 1843, 1855 (2017).  Repeatedly, and most recently in *Hernandez* v. *Mesa*, the Court has made clear that "expansion of *Bivens* is a disfavored judicial activity."  140 S. Ct. 735, 742 (2020) (internal quotation marks omitted).

   This Court need not reach the question whether the *Bivens* remedy should be extended to this distinct context because a *Bivens* claim must be brought against a federal official in his individual capacity, rather than his official capacity, and only for his own acts.  "The shield of sovereign immunity protects not only the United States but also its agencies and officers when the latter act in their official capacities."  *Dotson* v. *Griesa*, 398 F.3d 156, 177 (2d Cir. 2005); *accord Equal Vote Am. Corp.* v. *Congress*, 397 F. Supp. 3d 503 (S.D.N.Y. 2019), *aff'd sub nom. Liu* v. *U.S. Congress*, 834 F. App'x 600 (2d Cir. 2020) (summary order).  Furthermore, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  *Iqbal*, 556 U.S. at 676; *see also Abbasi*, 137 S. Ct. at 1860 ("The purpose of *Bivens* is to deter the officer.  *Bivens* is not designed to hold officers responsible for acts of their subordinates." (internal citation and quotation marks omitted)).

   Plaintiff's SAC names former Secretary of State Mike Pompeo as a Defendant in his official capacity only (SAC ¶ 3), and states that "Defendants Pompeo and Department of State are liable under the doctrine of *respondeat superior*" (*id.* at ¶ 79).  These claims are barred by sovereign immunity and thus must be dismissed for lack of subject matter jurisdiction.  *See, e.g.,*

*Hadwan* v. *U.S. Dep't of State*, No. 17 Civ. 578 (WHP), 2019 WL 4889373, at \*2 (S.D.N.Y. Oct. 3, 2019) (collecting cases).

**D.    Plaintiff's Transfer Denial Claims**

Finally, Defendants argue that Plaintiff lacks standing to challenge the IPT Unit's discretionary determination to decline to transfer Plaintiff to the United Kingdom.  (Def. Br. 27-30).  As have other district courts in this Circuit and other circuit courts when faced with similar challenges, this Court concludes that Plaintiff lacks standing to bring his APA and due process claims, and that he is not entitled to mandamus relief.  Accordingly, these claims must be dismissed.

**1.    Applicable Law**

The Transfer Act, 18 U.S.C. §§ 4100-4115, sets forth procedures for the transfer of an offender to or from a foreign country pursuant to a treaty between the United States and the foreign country.  Under 18 U.S.C. § 4102, the Attorney General is authorized to act on behalf of the United States pursuant to such treaty and to effect transfers of offenders in the United States to foreign countries of which they are citizens.  This provision does not contain any limitations on the exercise of the Attorney General's discretion.

As relevant here, the United States and the United Kingdom are both signatories to the Convention on the Transfer of Sentenced Persons, E.T.S. 112.  The Convention provides that an individual incarcerated in one country may "express his interest" in a potential transfer either to the "sentencing State" or the "administering State," *i.e.*, the country to which transfer is sought.

22

E.T.S. 112 arts. 1(c)-(d), 2(2).  The actual transfer decision requires the approval of both countries, in addition to the prisoner.  *Id.* art. 3(1)(d), (f).  After a country receiving a request for transfer is notified of the request, the Convention requires this country to promptly inform the other country of its decision.  *See id.* art. 5(4).  The Convention does not provide any guidelines or factors that either country must consider in determining whether a transfer is appropriate.

###   2.   Analysis

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise."  *United States* v. *Suarez*, 791 F.3d 363, 366 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Kowalski* v. *Tesmer*, 542 U.S. 125, 128 (2004)).  Constitutional standing requires, *inter alia,* that the plaintiff suffer "an injury in fact ... which is [i] concrete and particularized ... and [ii] actual or imminent, not conjectural or hypothetical."  *Rajamin* v. *Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 85 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Prudential standing prevents "litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves."  *Suarez,* 791 F.3d at 366 (internal quotation marks omitted).  Plaintiff bears the burden of establishing standing.  *Rajamin*, 757 F.3d at 84.

Plaintiff does not demonstrate that he has either constitutional or prudential standing with respect to the transfer denials. *First*, he cannot show an injury in fact, *i.e.*, "an invasion of a legally protected interest," *Lujan*, 504 U.S. at 560, because neither the Convention nor the Transfer Act provides the Department of Justice with "particularized standards or criteria to guide the Attorney General in making such decisions," and thus "individuals do not have a protected liberty interest in transfer," *Manning* v. *U.S. Dep't of Justice*, No. 16 Civ. 9961 (ALC), 2017 WL 6507105, at *2 (S.D.N.Y. Dec. 18, 2017) (internal quotation marks omitted) (quoting *Bagguley* v. *Bush*, 953 F.2d 660, 662 (D.C. Cir. 1991) (per curiam)). *See also Scalise* v. *Thornburgh*, 891 F.2d 640, 649 (7th Cir. 1989) (holding that the Transfer Act does not create a liberty interest protected under the Due Process Clause in offenders seeking transfer).

Plaintiff points to the Second Circuit's decision in *Wong* v. *Warden, FCI Raybrook*, 171 F.3d 148 (2d Cir. 1999), in which the Court, in a per curiam opinion, affirmed a district court's holding that it had jurisdiction to review a constitutional challenge to a decision by the Department of Justice to deny the plaintiff a transfer under the Convention. (*See* Pl. Opp. 17-18). However, the plaintiff in *Wong* clearly alleged "unconstitutional discrimination on the basis of race and national origin and in retaliation for his refusal to talk with law enforcement officials." 171 F.3d at 149. In such circumstances, the Second Circuit explained, "judicial review exists over allegations of constitutional violations even when the agency decisions underlying the allegations are discretionary." *Id.* In contrast, Plaintiff's SAC, the operative pleading in this

case, does not allege that he has been denied transfer based on a protected characteristic.  Rather, he argues that the denials are arbitrary and capricious and unwarranted by the facts because there is no basis for the IPT Unit's conclusion that "seriousness of the offense" and "law enforcement concerns" counsel against transfer.  (*See* SAC ¶¶ 53-55).[9]  Thus, *Wong* is inapposite and Plaintiff fails to demonstrate constitutional standing based on the facts alleged in his SAC.  *See Manning*, 2017 WL 6507105, at *2.

*Second*, even if Plaintiff could demonstrate constitutional standing, he cannot establish prudential standing because there is no private right of action under either the Convention or the Transfer Act to compel a transfer.  "Whether a treaty creates a right in an individual litigant that can be enforced in domestic proceedings by that litigant is for the court to decide as a matter of treaty interpretation."  *Mora* v. *New York*, 524 F.3d 183, 193 (2d Cir. 2008).  As a general rule, treaties "establish rights and obligations between State-parties," and "not between states and individuals, notwithstanding the fact that individuals may benefit because of a treaty's existence."  *United States* v. *Barinas*, 865 F.3d 99, 104-05 (2d Cir. 2010).  "Absent a private enforceable right created by treaty, an individual lacks standing to challenge an alleged violation of that treaty."  *Manning*, 2017 WL 6507105, at *3.

---

[9]     Plaintiff does state in his First Amended Complaint, which was superseded by the SAC, that the denial of his transfer requests is based on "race, religion, [and] national origin." (Dkt. #22 at 3).  But this allegation is wholly conclusory and he asserts no facts in support of it.  Even if the Court were to consider allegations in Plaintiff's earlier pleadings, it would conclude that such a constitutional claim as might bring Plaintiff's case in line with *Wong* v. *Warden, FCI Raybrook*, 171 F.3d 148 (2d Cir. 1999), is inadequately pleaded.

The Convention does not expressly provide a private right of action to an individual seeking a transfer.  *See Manning*, 2017 WL 6507105, at *3.  "'The Convention never *requires* a state to transfer a prisoner; rather, the agreement only allows transfer when all three parties (the prisoner and both states) agree to it."  *Id.* (internal quotation marks omitted) (quoting *Toor* v. *Holder*, 717 F. Supp. 2d 100, 107 (D.D.C. 2010) (citing Convention art. 3(1)(d), (f))).  In this case, the United States has not consented.  Plaintiff has no entitlement under the Convention or the Transfer Act to seek a court order compelling a different result.  *See Toor*, 717 F. Supp. 2d at 107 ("Since the Convention has no express language to rebut a presumption against a private right of action, plaintiff lacks standing to sue under the treaty or its implementing statute, 18 U.S.C. § 4102.").

Nor does the APA provide an alternative path for Plaintiff to challenge the IPT Unit's decision.  Under the APA, "a person suffering legal wrong because of agency action ... is entitled to judicial review" unless the challenged agency action "is committed to agency discretion by law."  5 U.S.C. §§ 701(a)-702; *see also Dep't of Com.* v. *New York*, 139 S. Ct. 2551, 2567 (2019).  An action has been committed to agency discretion by law, and is therefore unreviewable, if "the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Dep't of Com.*, 136 S. Ct. at 2568 (internal quotation marks omitted) (quoting *Weyerhaeuser Co.* v. *U.S. Fish and Wildlife Serv.*, 139 S. Ct. 361, 370 (2018)).  "To determine whether there [are] ... judicially manageable standards for

judging an agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action." *Salazar* v. *King*, 822 F.3d 61, 76 (2d Cir. 2016) (internal quotation marks omitted) (citing *Westchester* v. *U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 419 (2d Cir. 2015); *Heckler* v. *Chaney*, 470 U.S. 821, 830 (1985)).

While the Second Circuit has not yet had occasion to consider the reviewability of the Department of Justice's actions pursuant to the Convention, the D.C. Circuit and Seventh Circuit have both done so and have concluded that transfer decisions are not reviewable under the APA. *See Bagguley*, 953 F.2d at 662 ("[B]ecause the [Transfer Act] and the [Convention] give the Attorney General unfettered discretion with respect to transfer decisions, … such decisions constitute agency action committed to agency discretion by law. Such decisions are, therefore, not reviewable according to 5 U.S.C. § 701(a)(2)."); *Scalise*, 891 F.2d at 648-49 ("In the absence of any standards upon which this court could review the Attorney General's discretionary authority … we conclude that Congress has … committed these determinations to the Attorney General's discretion."). The Court's own reading of the Convention leads it to the same conclusion. *Accord Toor*, 717 F. Supp. 2d at 108-09; *cf. Sluss* v. *U.S. Dep't of Justice*, No. 14 Civ. 0759 (CRC), 2016 WL 6833923, at *3 (D.D.C. Nov. 18, 2016) (interpreting the bilateral Treaty between the United States of America and Canada on the Execution of Penal Sentences). And Plaintiff points to no regulation, agency guidance, or other

27

provision of law that purports to limit the Attorney General's discretion.  *Cf.* *Lunney* v. *United States*, 319 F.3d 550, 558-59 (2d Cir. 2003) ("Even assuming (as Plaintiff apparently does) that an APA claim could be founded on something other than a statute or regulation, the cases cited in [P]laintiff's brief furnish no basis for the idea that the Navy's discretion in possessing a Medal of Honor is limited in any way.").  Thus, Plaintiff's claim under the APA must also be dismissed.

Finally, Plaintiff's requested mandamus relief is not available.  Under 28 U.S.C. § 1361, the "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  "Mandamus is an extraordinary remedy, intended to aid only those parties to whom an official or agency owes 'a clear nondiscretionary duty.'"  *Escaler* v. *U.S. Citizenship & Immigr. Servs.*, 582 F.3d 288, 292 (2d Cir. 2009) (quoting *Heckler* v. *Ringer*, 466 U.S. 602, 616 (1984)).  "A party who seeks a writ of mandamus must show a clear and indisputable right to its issuance."  *Id.* (internal quotation marks omitted) (quoting *Miller* v. *French*, 530 U.S. 327, 339 (2000)).  As discussed previously, the Transfer Act imposes no affirmative obligation on the Attorney General to grant a requested transfer, but rather leaves it entirely to his discretion.  In the absence of such an obligation, the Court may not exercise mandamus jurisdiction.  *See Scalise*, 891 F.2d at 648 (vacating a writ of mandamus issued by the district court on the basis that the Transfer Act imposes no affirmative obligation on the Attorney General); *Sluss*,

28

2016 WL 6833923, at *3 ("[B]ecause DOJ's decision to deny Sluss's transfer request is discretionary, a writ of mandamus is similarly unavailable to him.").

### E.  Plaintiff's Claims Against John Doe #1

The Court concludes with Plaintiff's claims against John Doe #1, who was added as a Defendant in the SAC filed February 7, 2020.  John Doe #1 is sued in both his official and individual capacities.  (SAC ¶ 4).  Plaintiff alleges claims against John Doe #1 under the First Amendment, the Fifth Amendment, the APA, RFRA, and *Bivens*, and seeks both declaratory and mandamus relief against him.  (*Id.* at ¶¶ 56-79).

Federal Rule of Civil Procedure 4 requires that a party suing a United States employee in his official capacity serve the employee by "serv[ing] the United States and also send[ing] a copy of the summons and of the complaint by registered or certified mail to the ... employee."  Fed. R. Civ. P. 4(i)(2).  Subsection (i)(3) requires that, "[t]o serve a United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf (whether or not the officer or employee is also sued in an official capacity), a party must serve the United States and also serve the officer or employee under Rule 4(e), (f), or (g)."  *Id.* 4(i)(3).  Subsection (i)(4)(a) requires that a court "allow a party a reasonable time to cure its failure to ... serve a person required to be served under Rule 4(i)(2), if the party has served either the United States attorney or the Attorney General of the United States."  *Id.* 4(i)(4)(A).  Finally, subsection (m) provides that "[i]f a defendant is not served within 90 days after the complaint is filed,

the court — on motion or on its own after notice to the plaintiff — must dismiss the action without prejudice against that defendant or order that service be made within a specified time." *Id.* 4(m).

The deadline for Plaintiff to serve John Doe #1 in accordance with Rule 4(m) was May 7, 2020. However, the docket reflects that, to date, Plaintiff has not served John Doe #1 in this matter. Plaintiff was on notice of the lack of service on John Doe #1, and the fact that the Government did not purport to represent him, no later than February 21, 2020. (*See* Dkt. #41 at 4). Yet Plaintiff has requested neither assistance from the Government or the Court in identifying the true identity of John Doe #1, nor additional time to effect service.

Accordingly, Plaintiff is Ordered to Show Cause in writing, on or before **April 23, 2021**, why his claims against John Doe #1 should not be dismissed for failure to serve.[10]

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss the Second Amended Complaint is hereby GRANTED in full as to Plaintiff's claims against the Secretary of State, the Department of State, the Attorney General, and the Department of Justice IPT Unit. These claims are dismissed with prejudice.

---

[10]   The Court notes the possibility, raised by the Government, that Plaintiff's *Bivens* claim against John Doe #1 may be barred by the statute of limitations. (*See* Def. Br. 26). The Court does not reach a conclusion on that issue at this time.

Plaintiff is ORDERED to Show Cause on or before **April 23, 2021**, why the Court should not dismiss as well his claims against John Doe #1.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case as to Defendants the Secretary of State, the Department of State, the Attorney General, and the Department of Justice IPT Unit only.

SO ORDERED.

Dated:      March 24, 2021
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge